The delay was caused by Judge Southwick presiding over a three-judge redistricting court for two weeks before starting oral arguments, so he's been performing above and beyond the call of duty, as he always does. Well, thank you. And as does Judge Graves. This is a redistricting case, isn't it? I'm a little behind in my preparation, but I think I got this one down. All right. Addis Kovac v. Christopher Wray, Ms. Mullen. Good morning, Your Honors. May it please the Court, Hannah Mullen for the Plaintiffs. As a matter of statutory interpretation, the Supreme Court has instructed that the government must point to a clear grant of authority from Congress when it asserts a power so vast that it causes a court to hesitate before concluding that Congress intended the government to have that power. Here there is ample reason for this court to hesitate before concluding that Congress granted the government the power to create the watchlisting system. The watchlist presently includes over 1.8 million names. The government claims the power to place an unlimited number of people on the watchlist and to turn their lives upside down without any notice, explanation, or opportunity to refute the allegations against them. Placement on the list turns ordinary travel into a humiliating ordeal filled with invasive searches, interrogations, and detentions. It can bar listees from flying altogether. It can affect immigration proceedings, including listees' applications for green cards and U.S. citizenship, listees' ability to obtain U.S. visas or sponsor them for family members. And because the federal government distributes the list to over 18,000 state and local entities and over 500 private companies, it shows up all over listees' everyday lives, affecting everything from traffic stops to security clearances to municipal permitting processes. It would be one thing if Congress had clearly authorized the government to create the watchlist and use it to ruin an unlimited number of people's lives, but it has not and this court should reverse. The government cannot point to clear congressional authorization of the watchlist. None of the cited statutes, separately or in combination, give the government the power to create the watchlisting system. Rather, the government points to two main buckets of statutory authority. In sections Roman 2a and 2b of their brief, the government points to statutory authorization to investigate, collect, and analyze terrorist-related intelligence and statutory requirements to share intelligence among federal agencies with appropriate state and local officials. Those authorities, Your Honor, are analogous to the FDA's power to regulate cigarettes as drugs and devices, or rather the power to regulate drugs and devices, Your Honors, which the Supreme Court did not hold to include cigarettes, excuse me, or the EPA's power to regulate air pollutants in U.R. Those very high-level, broad statutory authorizations do not meet the clear statement rule that we apply here, Your Honor. Ms. Mullen, I think your brief acknowledges, not acknowledges, that's the wrong word, states that perhaps the statute most on point, but there certainly are many others, is section 114, if I misremember how you put it, but let's look at 114H, Consultation Transportation Security Oversight Board, the Administrator's Shield, and then a variety of things, establish policies and procedures requiring air carriers to use information from government agencies to identify individuals on passenger lists who pose a threat, and off it goes. And obviously, that's just one of a collection of statutes. It also authorizes memorandum of understanding for these agencies to work together. What is missing in this collection of statutes? Even that word, I think it's one word, watch list, appears. Tell me, what's missing? Yes, Your Honor. So that takes us, I think, to sections 2C and 2D of the government's brief, where they go through the more specific statutory authorities. I'll take 114H first. We think, Your Honor, that in the realm of the clear statement rule, statutes have to be read to mean what they say. And so in the 114H context, I think at most, Your Honor, that authorizes the existence and use of the watch list in the passenger screening context. And I think the government is trying to use— What do you mean by screening? They are at the airport— Yes, Your Honor, the TSA— The medical detectors and whatever? Yes, Your Honor, the TSA passenger screening context that we would be familiar with. And, Your Honor, I think reading the statute to that scope, which is what 114H is about, it's a pretty specific statute focused on passenger screening requiring air carriers to use information from government agencies to identify individuals on passenger lists and then to do certain things if— What's the need of identifying them if all it's talking about is the x-ray machine? You don't need to identify them in advance, it seems to me. Yes, Your Honor, but we think the way that the government is citing 114H— And then some of these other statutes as well, Your Honor, you know, they cite pretty specific language from the Homeland Security Act of 2002, for example, that says, you know, if somebody would like to sell ammonium nitrate, they should be screened against the watch list. Or, you know, chemical facilities vetting certain people, certain security positions for public transportation systems like buses or railroads should be screened against the watch list. And I don't think that those congressional acknowledgments or instructions to use the watch list in those particular contexts. So in 114H, it's passenger screening at airports. In some other provisions, it's these, you know, folks buying and selling dangerous chemicals or insensitive positions in transportation networks. We think that shows that Congress wanted some kind of list to be used in those particular settings. But the problem, I think, with that argument is that it doesn't get the government any further than the scope of those statutes. And the watch listing system is much broader than that. As I mentioned in my opening, it stretches well beyond passenger screening and chemical facilities. I haven't heard all that you said. I want to hear specifically what it is you're claiming the government is doing that exceeds the authority under the statute. Yes, Your Honor. We're focused on the entire watch listing system. So that's the creation, administration. Well, it doesn't have the right to have a watch listing system. Your Honor, it doesn't have the right to have a watch listing system that exceeds the statutory authorities that Congress gave it. Well, then I'm asking you specifically, what's the government doing that exceeds the authority the government has given under the statute? What is your specific claim about what it's doing? Yes, Your Honor. Our claim is what the government— so I'll go through the various ways that the watch list is used beyond passenger screening in these narrow circumstances. As I mentioned in my opening and as the district court reviewed, the watch list can affect immigration proceedings. It can affect citizenship proceedings. It can affect visa proceedings. And it shows up all— All of that exceeds its authority under the statute. Is that what you're saying? Yes, Your Honor. Because it's not—and I'll also back up a little bit, Your Honor, and note that the watch listing system as a whole, the way that the government has set up this system is not contemplated anywhere in statute. And— In what? In a statute, Your Honor. So after 9-11, right, and I think my friends from the government and I agree on this, the Congress was laser-focused on how to best set up agencies to further national security. So that's where we get acts like the Homeland Security Act of 2002, where they're taking agencies from, you know, scattered across the government and consolidating them in, for example, under the umbrella of the Department of Homeland Security, and Congress is very focused on how should agencies fit together to best protect the national security. One thing that doesn't show up in any of that is the federal terrorist watch listing system, the FBI's administration of the terrorist screening center, the way that the different agencies come together and relate to one another within that system. None of that is reflected anywhere in statute. And I think that's a pretty significant red flag, Your Honor. I think it would be quite unusual if the government came to you, for example, and said, well, we've just decided that instead of CBP and TSA being two separate agencies, we've decided to put them together under the umbrella of the Department of Homeland Security. Of course, that's something that Congress had to do. And similarly here, we think that the agency superstructure that has been created to maintain and distribute and use the watch list, it's very striking that it's not set out anywhere in statute. And I understand my friends from the government to be finding these little pieces of statutory authority throughout the U.S. Code, for example, in the passenger screening context, 114H, or the sale of ammonium nitrate, or the other little breadcrumbs. But I think that misses the forest for the trees, because the watch listing system as a whole is simply nowhere in the U.S. Code. Well, counsel, let me ask you, forest and trees is a good segue. The government argues that the only issue really before us is the legitimacy of the selectee list. You rely on Alabama realtors or whatever the name of the case is to say the whole statute is before us. It seems to me your clients have standing to challenge the selectee list. And whether it can go further than that is something you need to convince us. When I looked at Alabama realtors, it's really talking about an extraordinarily broad statute on its face. Is that your best case for saying the whole Watsliff regime is before us? Your Honor, I think my best case is UARC, but you'll have to stick with me to get there. So our argument is that when a plaintiff comes before a court and they've suffered Article III injury at the hands of an administrative action by an agency, they have standing to challenge the entire scope of the agency's claimed power because it's a statutory interpretation question. You know, was the power that the agency was claiming, did Congress actually give that to the agency? And I think our best site— Do you see a very major distinction between the no-fly list and the selectee list? So, Your Honor, is it okay if I finish my answer and then come to that? No. Okay, so in that case, no, there is not a significant distinction because of how the watch list works. Each entry in the terrorist screening data set is just one entry of the name, and some of them have no-fly annotations, so they're actually not even a separate list. We say no-fly list colloquially because it makes it easier to understand, and the consequences certainly can affect people's lives in a significant and a different way than being on the selectee list, but it's all the terrorist screening data set, and there are just different annotations in it. So no, we don't think there's a significant difference there. But to return to UARG, the petitioner there in UARG was kind of like an industry group. Excuse me? The petitioner where? In UARG, the greenhouse gas case from the Supreme Court, and there the kind of cornerstone logic of the Supreme Court's decision that the major questions doctrine applied was that if the court had accepted the government's interpretation, the regulatory scope of the Clean Air Act would have swept in many, many, many smaller sources, smaller emitters that hadn't previously been covered by the interpretation of the act, and the court didn't pause to ask whether UARG itself or its members would be affected by that change. There was no discussion of whether the party before the court was a small source or whether its interests were implicated by those small sources. It was just the logic was this is a regulated party before the court, and now we're going to examine whether the agency has the power to claim the full scope of the authority that it's telling us that it has, and we think that's analogous to what we're doing today. When you started your argument, you mentioned the, I suppose, fairly familiar phrase about the major questions doctrine applies when you have to pause to determine whether Congress gave that authority to an agency. Do you have any better or more concrete defining line than pause? I mean, one man's pause is another man's race. I question the major questions doctrine even applying here. Your Honor, the best language we can point you to, the most precise language, is page 721 of West Virginia versus EPA, which says that cases that might cause a court to pause are cases in which the history and breadth of the authority that the agency has asserted and the economic and political significance of that assertion. Well, that's where I say, well, that's true of just about any statute, and we're dealing here with national security. That's unchallenged after a horrific, tragic incident in this nation's history, which is still ongoing. So I just question, and I'm not saying one way or the other, it's just difficult when we're dealing with a matter of national security, et cetera, et cetera, and clear and obvious danger still 23 years later, whether the doctrine even applies. In 40 seconds, I'll make my best case. The size and consequences of the list are extremely significant. There are 1.8 million people on it and counting, and the government claims the power to list an unlimited number of people, including U.S. citizens. We think that goes to the Alabama Association of Realtors' language about a breathtaking amount of authority with no identifiable limits, and the consequences of the list, which I detailed in my opening, are quite significant. We think that goes to NFIB, significant encroachment into the lives of a vast number of people. Now we sort of go back to Brad Southwick's question about standing, because you're not here before us on a no-fly list case. None of these, one man, Kovach, was on it. He's not on it anymore. And so you're thinking, well, so they're delayed in getting on the plane, or it's a little uncomfortable. None of us like going through these procedures at the airport, but it has a diminished scope because of no one being on the no-fly list that's a plaintiff in this case. Very briefly, Your Honor. I think that qualifies as a question or at least a response. You take some limited time to respond to it. Sure. Very briefly, I think as I said to Judge Southwick earlier, as we explain in our brief, we think that once a plaintiff comes forward with a challenge to agency action, that brings the full scope of the agency's claim to power within this Court's ability to evaluate under the Major Questions Doctrine. Thank you. All right, counsel. We'll hear from you again. Thank you. Good morning, Your Honors. Joshua Waldman from the Department of Justice for the Applebees. Congress clearly authorized the creation, maintenance, and use of the Federal Terrorist Watch List, including its use by TSA to conduct passenger screening against the no-fly and selectee lists. After the terrorist attacks of September 11th, Congress enacted a major transformation of the national security apparatus to address two of the failures of that day. First, the failure to effectively share information across the United States government, and second, a failure to keep terrorists off civilian aircraft. Congress addressed the first problem, the information-sharing problem, in a series of provisions discussed in our brief at pages 17 through 21 that broadly authorized the President to create an information-sharing environment in which terrorist and national security information would be shared across federal agencies and with state and local authorities and with private entities as appropriate. Congress addressed the second issue by authorizing TSA to screen passengers against the terrorist watch list using those specific words, terrorist watch list, and to do so in consultation with the terrorist screening center using that agency's name specifically in the statute. These are the provisions discussed in pages 25 through 27 of our brief. I heard Ms. Mullen say that Congress was laser-focused on this question of keeping terrorists off of planes and screening against passenger watch lists. And since that's really the only allegations in the complaint in the district court, I think that's sort of the beginning and the end of this case. We don't think that the major question doctrine applies, but even if it did, we think the statutory language is so unambiguously clear about these points that it would satisfy anything that doctrine would demand. I'm happy to answer any questions if the court had any. One question I have is just the argument of whether this case is limited to the selectee list or whether it is a proper challenge to the entire set of statutes. I think it's really about the selectee list, and I think that's really the only Article III injury that was stated in the complaint. But we are happy to defend the statutory authority for all of the other consequences that are mentioned in the plaintiff's case. We're not scared of that in the least. I'm not suggesting the government would back away from defending any part of this. I'm just asking what is actually before us. We deal in our limited jurisdiction on issues properly raised, and I'd like your take on what is properly raised to this court. I think what's properly raised is a challenge to the statutory authority to screen the passengers against the selectee list using the terrorist screening database. And those are the allegations in the complaint. As Your Honor noted before, there used to be a no-fly list claim that no longer exists. Those are the injuries that were stated below. As we said in our brief, cases like Abdi have held and al-Hadi held that when plaintiffs come in with challenges to all kinds of other things that they think the watch list does, but that don't relate to their claimed Article III injuries in their complaint, that they don't have standing to bring that challenge. But I do want to say, just to put your minds at ease, and in case you're curious about it, many of the things that the plaintiffs are concerned about, these are pages 10 and 11 of their brief, talk about sharing it with the information from the terrorist watch list with state and local entities and a bunch of other entities that they name there. This authority has existed since 1966 by statute. The FBI administers something called the National Crime Information Center, which collects criminal history records and other such information. It's existed by statute since 1966. It's 28 USC 534. It's cited in our brief. And under that authority, the FBI has always collected this information and shared it with appropriate state and local officials, and sometimes with private entities who have a connection to law enforcement purposes. The statute existed long before the terrorist screening database existed and will continue to exist regardless of the outcome of this case. So all of this has been authorized by statute. In the Immigration Act, before the terrorist screening center existed, before what is currently the federal watch list existed, in 8 USC 1105B, Congress mandated access to the NCIC to the State Department for purposes of doing its immigration functions. Since 1997, Congress required under Section 1158 D5A of the INA that no one can get asylum before state checks lookout, which is lookout is the watch list that State Department has used even before 9-11 to take care of its asylum and immigration and other functions. So Congress has authorized this up and down all of these functions that they complain about that go beyond what happens in the airport, though we don't think that they're properly part of this case. They've all been clearly authorized by Congress even before TSA ever existed. Well, counsel, if that's all you have for us. Yes, thank you, Your Honor.  I think just to give Your Honor a precise site for our best authority that the full sweep is before you, that's on page 6 of our reply brief, and it describes the circumstances in utility air regulatory group versus EPA where the Supreme Court, we think, didn't stop to ask whether the petitioner's specific interests were implicated by the broad sweep of the regulatory assertion that was before the court and instead evaluated the entire regulation. We think that's the right framework for this court to be looking at the case. I don't think Your Honors need to worry about an Article III jurisdiction or a standing problem, but, and I think, and my last point, Your Honor, is that I think viewed in that broad lens, the entire watch listing system and the consequences that it causes for the unlimited number of people, including U.S. citizens who could be placed on it, are not authorized by statute. Thank you, Your Honor. All right, counsel. You both gave us some of your time back. We appreciate that.